Erin J. Ruben*
**LEE SEGUI PLLC**
421 N. Harrington St., Suite 460
Raleigh, NC 27603
(919) 421-7266 (phone)
eruben@leesegui.com

*Attorney for Plaintiff and Putative Classes*
*Other Counsel on Signature Page*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JUSTIN BREWER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>JERSEY MIKE'S FRANCHISE SYSTEMS, INC.,<br><br>Defendant. | **CASE NO. 5:26-cv-535-SSS-DTB**<br><br>**Hon. Sunshine Suzanne Sykes**<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PURSUANT TO FAA**<br><br>**Hearing Date: June 26, 2026** |

# TABLE OF CONTENTS


INTRODUCTION……….........……………..………………………………..…...1

FACTUAL BACKGROUND……….…………………………………………..….2

LEGAL STANDARD……….…………………………………………………...6

ARGUMENT……………………………………………………………………8

I. JMFS'S MOTION FAILS BECAUSE THE AGREEMENT IS FACIALLY INAPPLICABLE TO THE CLAIMS ASSERTED IN THIS ACTION………8

A. The Agreement's Plain Language Covers Only "This Website"………10

B. Website and Mobile Applications Are Not Synonymous……………...10

C. The Presumption of Arbitrability Does Not Apply Because the Agreement Is Not Ambiguous……………………………………….....12

D. Brewer's Claims Arise Exclusively from App-Based Transactions…...13

E. JMFS's "Factually Intertwined" Theory Fails……………………….....15

F. JMFS's Remaining Arguments Each Fail…………………………...17

G. Brewer's Own Statements Cannot Expand the Scope of the Arbitration Clause……………………………………………………………..19

II. INDEPENDENTLY, JMFS FAILS TO ESTABLISH THE EXISTENCE OF AN ENFORCEBALE ARBITRATION AGREEMENT…………………...20

A. The App Did Not Provide Any Notice of Terms……………………….21

B. JMFS Cannot Rely on the April 2018 Email for Notice………......…...23

CONCLUSION……………………………………………………………...28

# TABLE OF AUTHORITIES

## CASES

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849, 856 (9th Cir. 2022) .......... 22

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126, 1130 (9th Cir. 2000) .......... 7

*Doe v. Kaiser Found. Health Plan, Inc.*,
725 F.Supp.3d 1033 (N.D. Cal. 2024) .......... 15

*Evox Prods. LLC v. Kayak Software Corp.*
2017 WL 5634858, at *1 (C.D. Cal. Apr. 4, 2017) .......... 11

*Ghazizadeh v. Coursera, Inc.*
737 F. Supp. 3d 911, 922-23 (N.D. Cal. 2024) .......... 11, 27

*Godun v. JustAnswer LLC*,
135 F.4th 699, 710 (9th Cir. 2025) .......... 26

*Goldman, Sachs & Co. v. City of Reno*,
747 F.3d 733, 742 (9th Cir. 2014) .......... 7,12

*Granite Rock Co. v. Int'l Bhd. Of Teamsters*,
561 U.S. 287, 301 (2010) .......... 13

*Hansen v. Musk*
122 F.4th 1162, 1174 (9th Cir. 2024) .......... 18

*In re Bennett*,
298 F.3d 1059, 1064 (9th Cir. 2002) .......... 6

*Int'l Bhd. of Teamsters v. NASA Servs., Inc.*,
957 F.3d 1038, 1044 (9th Cir. 2020) .......... 7

*Ireland-Gordy et al. v. Tile, Inc. et al.*,
2026 WL 594859, at *1 (9th Cir. Mar. 3, 2026 .......... 11, 25, 26

*Johnson v. Walmart Inc.*
57 F.4th 677 (9th Cir. 2023) .......... 13

*Klamath Water Users Protective Ass'n v. Patterson*,
204 F.3d 1206, 1210 (9th Cir. 1999) .......... 10

*Mundi v. Union Sec. Life Ins. Co.*,
555 F.3d 1042, 1044–45 (9th Cir. 2009) .......... 7

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171, 1178–79 (9th Cir. 2014) .......... 21

*Perez-Encinas v. AmerUs Life Ins. Co.*,
468 F. Supp. 2d 1127, 1133 (N.D. Cal. 2006) .......... 7

*Revitch v. DIRECTV, LLC*,
977 F.3d 713, 716 (9th Cir. 2020)..........7

*Rushing v. Williams-Sonoma, Inc.*,
No. 16-CV-01421-WHO, 2025 WL 2391394, at *4 (N.D. Cal. Aug. 18, 2025)......11

*Saeedy v. Microsoft Corp.*,
757 F. Supp. 3d 1172, 1204 (W.D. Wash. 2024),..........15

*SmartText Corp. v. Interland, Inc.*,
296 F.Supp.2d 1257 (D. Kan. 2003)..........16

*Ticketmaster L.L.C. v. Prestige Entertainment West, Inc.*,
315 F.Supp.3d 1147, 1160 (C.D. Cal. 2018)..........3

*United States ex rel. Welch v. My Left Foot Children's Therapy, LLC*,
871 F.3d 791, 796 (9th Cir. 2017)..........9

*Walsh v. Ariz. Logistics, Inc.*,
998 F.3d 393, 396 (9th Cir. 2021)..........10

*White v. PayPal Holdings Inc.*,
No. 25-CV-04884-PCP, 2026 WL 496712, at *5 (N.D. Cal. Feb. 23, 2026)..........22

*Wilson v. Huuuge, Inc.*,
944 F.3d 1212, 1220 (9th Cir. 2019) (citing *Nguyen*, 763 F.3d at 1179)...........21

**STATUTES**

Cal. Bus. & Prof. Code § 22580...........12

Justin Brewer ("Plaintiff" or "Brewer"), by and through undersigned counsel, on behalf of all others similarly situated, submits the following memorandum of law in opposition to Motion to Compel Arbitration and Stay Pursuant to FAA (ECF No. 22) ("Mot.") filed by Defendant Jersey Mike's Franchise Systems, Inc. ("Defendant" or "JMFS") in this action.

## INTRODUCTION

This case is about Jersey Mike's mobile application (the "App"). Brewer's claims arise from a 2024 purchase completed through the App, challenge disclosures presented through the App's ordering and checkout flow, rely on screenshots taken from the App, and seek relief on behalf of a narrowly tailored class of consumers who ordered through the App. JMFS now seeks to compel arbitration of Brewer's App-focused claims based on its 2018 Website Terms of Use—terms that are constrained in scope to disputes related to the Jersey Mike's website and which never once mention the App.

The fundamental question before the Court is whether the precise contract term "website" actually means "mobile application." This is a purely legal question of contract interpretation. If the Court finds the plain language of the agreement limits its scope solely to website usage, JMFS's motion to compel fails. *Even if* the Court were to engage in a fact-intensive analysis of contract formation, the record still demonstrates no agreement governing usage of the App was ever formed between the parties.

JMFS, as drafter of the agreement, chose to limit its scope. The Court may not rewrite the contract simply because JMFS now wants to avoid litigating this matter as a class action in federal court. JMFS could have chosen to bring usage of the App within the scope of its terms of use at any time by: (1) revising the terms to include language referencing the App and App-related disputes; and (2) providing notice of the revised terms to all App users. It has done neither.

Arbitration is a matter of consent, and courts may *only* compel arbitration of disputes the parties *actually agreed* to arbitrate. JMFS therefore bears the burden of establishing not only the existence of an arbitration agreement, but also that Brewer's claims fall within the scope of that agreement. JMFS cannot meet that burden here. The motion should be denied.

## FACTUAL BACKGROUND

This action challenges JMFS's assessment and disclosure of a Service Fee in connection with delivery orders placed through Jersey Mike's App. *See, generally*, Complaint ("Compl."), ECF No. 1. The App is a unique software platform consumers download onto their personal mobile devices. *Id.* ¶ 2. The App cannot be accessed via the Jersey Mike's website (the "Website")[1] or the internet generally; consumers must visit an "app store" to download the App. *See* ECF No. 22-13 at 1. Like all mobile applications, it maintains a fundamentally unique coding structure and different

[1] www.jerseymikes.com.

underlying technology from the Website. *See, e.g., Ticketmaster L.L.C. v. Prestige Entertainment West, Inc.*, 315 F.Supp.3d 1147, 1160 (C.D. Cal. 2018) (distinguishing website code from mobile app code). JMFS confirms the App maintains a distinct user interface differentiating it from the website. *See* Declaration of John Hopper, ECF No. 22-1 ("Hopper Decl.") at ¶ 10.

The App's user interface ("UI")—the visual layout and collection of on-screen elements users interact with—is at the heart of Brewer's Complaint. Brewer alleges that JMFS designed the App's ordering and checkout process in a manner that obscured or misrepresented the nature of the challenged fee. Compl. ¶¶ 1-5, 24, 41-43. The Complaint includes screenshots of the App's UI and alleges consumers encounter the challenged disclosures while ordering through the App. *Id.* ¶¶ 30-32. The proposed classes are limited to consumers who placed orders through the App. *Id.* ¶¶ 105-107.

More than a decade prior to his App purchase, Brewer visited a Jersey Mike's store and signed up in-person for the company's rewards program. Hopper Decl. ¶ 20. JMFS does not contend Brewer agreed to arbitration during that in-store enrollment process, or that Brewer was presented with *any* associated terms of use. More than ten years later, Brewer used his rewards account to place a delivery order on the App. Compl. ¶ 56. Brewer was not notified any terms of use applied to his in-App purchase. JMFS does not contend Brewer accepted App-specific terms, clicked an App-based disclosure, or otherwise assented to arbitration in connection with his use of the App.

In fact, JMFS admits that it maintains no terms of use specific to the App. Mot. at 6.

***The Email Club***

JMFS separately contends Brewer enrolled in Jersey Mike's "Email Club" through the Website on March 7, 2013. Hopper Decl. ¶¶ 21-24. The Email Club is a passive email marketing program that is separate and distinct from the rewards program and does not require account creation. *Id*. ¶ 22. Participation in the Email Club is not necessary for placing an order on the App, and customers can sign up for the Email Club without ever making a purchase from a Jersey Mike's store.

JMFS alleges that upon enrollment in its Email Club, Brewer agreed to be bound by certain terms (the "2013 Website Terms"). *Id*. ¶¶ 23-24. Notably, the 2013 Website Terms did not include an agreement to arbitrate. *See* ECF No. 22-2 at 1. The 2013 Website Terms repeatedly limited themselves to Jersey Mike's website, providing: "[y]our access to and the use of Jersey Mike's web site is subject to the following terms and conditions" and "[t]hese terms and conditions apply ONLY to those areas that are on the Jersey Mike's web site." *Id*.

***2018 Website Terms***

On February 5, 2018, JMFS published revised terms (the "2018 Website Terms") on its Website that included an arbitration provision. Hopper Decl. ¶ 25. Months later, on April 25, 2018, JMFS sent Brewer an email entitled "Terms & Conditions Update." Hopper Decl. ¶¶ 26-28.

The email stated:

> "We've updated our website's Terms & Conditions and Terms of Use ..."

It further advised recipients:

> "Your continued use of our website from that day on is subject to the new Terms."

And it concluded:

> "By accessing our website, you agree to comply with and be bound by the updated Terms."

*See* ECF No. 22-7 at 1.

Like their predecessor, the 2018 Website Terms repeatedly describe a single subject matter: Jersey Mike's Website. The email did not mention mobile applications, mobile ordering, app transactions, or app users. *Id*.

The arbitration provision included in the 2018 Website Terms defines a covered "Claim" as: "Any legal or equitable dispute ... relating in any way to this Website." *See* ECF No. 22-3 at 1. The phrase "*this Website*" necessarily refers to the official Jersey Mike's website, where the terms are published and maintained. *Id*.

Although JMFS seeks enforcement of the 2018 Website Terms, JMFS acknowledges it revised the terms in June and December 2023. Hopper Decl. ¶ 16. Neither version of the 2023 terms includes any reference to the App. *See* ECF No. 22-4; ECF No. 22-5.

When Brewer accessed the App in 2024, he was never presented with App-specific terms and was never asked to assent to arbitration through the App. Hopper Decl. ¶ 11. Although JMFS describes account-creation screens that may be shown to new App users *today* who want to create a *new online account* in the App, JMFS does

not contend Brewer ever encountered those screens. *Id.* ¶¶ 13-14. In any event, JMFS admits there are no separate terms of use governing usage of the App—those that include an arbitration provision or that would otherwise expand the scope of the arbitration provision to include App-based activities, or otherwise. Mot. at 6.

***The App is a Distinct Platform***

JMFS's motion relies heavily on the assertion that the App once functioned as a webview of the website. But JMFS admits it redesigned the App in 2019 and that the App now has a "distinct user interface and no longer functions as a pure webview of the website." Hopper Decl. ¶ 10. Brewer's claims arise from a 2024 App transaction that occurred years after that redesign. There is no evidence Brewer made any in-App purchases prior to the App's 2019 redesign (or at any time prior to his undisputed 2024 purchase). *See, id.* ¶ 32. Accordingly, there is no evidence that Brewer was aware of any pre-2019 similarities in the design or functionality of the two separate platforms.

Even if the App was a webview in 2018, that does not change the fact that the App was a unique software platform with its own separate coding and technology. The parties' subjective understanding of the content contained on the two platforms cannot override the plain text of an agreement.

## LEGAL STANDARD

The interpretation of a contract is a question of law. *In re Bennett*, 298 F.3d 1059, 1064 (9th Cir. 2002). The court must look first to the language of the contract

in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. *Perez-Encinas v. AmerUs Life Ins. Co*., 468 F. Supp. 2d 1127, 1133 (N.D. Cal. 2006). Courts may not strain to create an ambiguity where none exists, nor is the language of a contract made ambiguous simply because the parties urge different interpretations. *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1044 (9th Cir. 2020)

Written agreements to settle commercial disputes by arbitration are subject to the Federal Arbitration Act ("FAA"). 9 U.S.C. § 2. The FAA limits the role of the judiciary "to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). If the court answers both questions in the affirmative, it must "enforce the arbitration agreement in accordance with its terms." *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 716 (9th Cir. 2020) (quoting *Chiron Corp.*, 207 F.3d at 1130). And "while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 743 (9th Cir. 2014) (internal quotation omitted). Likewise, the presumption in favor of arbitration does not apply if contractual language is plain that arbitration of a particular controversy is not within the scope of the arbitration provision. *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044–45 (9th Cir. 2009) (internal citations omitted).

# ARGUMENT

JMFS's motion presents two distinct questions: whether Brewer assented to the 2018 Website Terms and, if so, whether those terms encompass the claims asserted in this action. The Court need not resolve the first question to answer the second. Even accepting JMFS's formation evidence for purposes of this motion, the agreement JMFS seeks to enforce applies to disputes relating to Jersey Mike's Website and to web pages that are part of that website. Brewer's claims arise from a distinct and separate mobile application. The threshold issue therefore is one of contract interpretation: whether the agreement's Website-specific language extends to a different platform that the agreement never mentions. Because that question can be resolved from the face of the contract and independently disposes of the motion, as explained below in Section I, the Court need not reach the parties' factual dispute concerning formation. But, as explained below in Section II, it also is clear that no agreement to arbitrate was ever formed here.

JMFS characterizes Brewer's claims as strategically limited to the App. JMFS's argument confuses claim selection with contract interpretation. Brewer may choose the claims he brings, after which JMFS must prove those claims are subject to arbitration.

## I. JMFS'S MOTION FAILS BECAUSE THE AGREEMENT IS FACIALLY INAPPLICABLE TO THE CLAIMS ASSERTED IN THIS ACTION

The Court need not resolve the parties' factual dispute concerning formation

because JMFS's motion fails at a more fundamental level. Even accepting JMFS's formation evidence for purposes of this motion, JMFS cannot establish that the arbitration provision encompasses the claims asserted here. If the scope of an agreement is clear, a court must enforce its terms as written. *United States ex rel. Welch v. My Left Foot Children's Therapy, LLC*, 871 F.3d 791, 796 (9th Cir. 2017). Under the 2018 Website Terms, disputes over "the scope, application, and enforceability" of the arbitration agreement are for a Court to decide. *See* ECF No. 22-3 at 3.

As a threshold matter, JMFS conflates two distinct analytical steps: (a) who is subject to the arbitration clause, and (b) what claims that clause covers. The 2018 Website Terms define "Registered Users" to include those who register for email communications, register online accounts, or provide information to order food. JMFS argues that because Brewer satisfies each of these three categories, his food-ordering disputes are covered by the arbitration clause. But the "Registered User" definition speaks only to the first question—coverage of persons—not the second. The scope of covered claims is defined separately and exclusively by the arbitration clause itself, which requires arbitration of disputes "relating in any way to this Website." A user who orders food through the App may qualify as a "Registered User" for purposes of being subject to the clause, but that status does not expand the clause's subject matter beyond "this Website." These are two distinct inquiries, and JMFS's motion improperly collapses them. Even a Registered User is required to

arbitrate only what the agreement actually covers – and the agreement covers disputes relating to the Website, not the App.

**A. The Agreement's Plain Language Covers Only "This Website"**

The 2018 Website Terms, which were posted on the Website,[2] require arbitration of disputes "relating in any way to *this* Website" (emphasis added). The term "Website" is further defined by reference throughout the agreement using the URL www.jerseymikes.com. ECF No. 22-3 at 2. The agreement never references "mobile application," "app," or any other software platform.

To determine the reach of a particular agreement, the Court must look to its express terms. *Walsh v. Ariz. Logistics, Inc.*, 998 F.3d 393, 396 (9th Cir. 2021). Plain language is considered first. *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999). By choosing the phrase "this Website" rather than broader language, JMFS limited the agreement's scope to the Website actually referenced in the contract. Under California law, a contract is to be interpreted "to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal. Civ. Code § 1636. When a contract is unambiguous, the intention of the parties is ascertained from the writing alone. *Id.* §§ 1638, 1639.

**B. Website and Mobile Applications Are Not Synonymous**

As discussed in detail above, websites and mobile applications are distinct

[2] www.jerseymikes.com/terms-of-use

platforms by definition. Nonetheless, *Evox Prods. LLC v. Kayak Software Corp.* is instructive. No. CV15-5053 PSG (AGRX), 2017 WL 5634858, at *1 (C.D. Cal. Apr. 4, 2017). In that case, a court in this district held that a licensing agreement authorizing use on defendant's "portal website" unambiguously excluded defendant's mobile application, finding that the contract's multiple references to websites, webpages, and URLs reinforced that the license was limited to the website, and that defendant produced "no evidence that 'webpage' or 'URLs' somehow also mean 'mobile application.'" *Id.* at *4. The same analysis applies here. The 2018 Website Terms repeatedly reference "the website," "Jersey Mike's website," and the website's specific URL (www.jerseymikes.com). The App is never mentioned.

Courts in this circuit—including those cited by JMFS—consistently distinguish between websites and apps in the arbitration context. *See Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 925 (N.D. Cal. 2024) (recognizing the distinction between downloading an app and visiting a website); *Ireland-Gordy et al. v. Tile, Inc. et al.*, No. 25-403, 2026 WL 594859 (9th Cir. Mar. 3, 2026) (the arbitration provision notified consumers separately that access of website *or* mobile app would constitute assent); *Rushing v. Williams-Sonoma, Inc.*, No. 16-CV-01421-WHO, 2025 WL 2391394, at *4 (N.D. Cal. Aug. 18, 2025) (distinguishing formation of agreement on app versus on desktop or mobile browser).[3] The California state

[3] Courts in this circuit have also recognized the differences between websites and mobile apps in

legislature has similarly distinguished the two, listing websites and mobile applications in the disjunctive when regulating online services. *See, e.g.,* Cal. Bus. & Prof. Code § 22580.

JMFS's own evidence confirms the App is a distinct platform. Even accepting JMFS's characterization of the App as a website proxy in 2018, JMFS's own evidence establishes that this is no longer true: "In 2019, JMFS redesigned the mobile app. It now has a distinct user interface and no longer functions as a pure webview of the website." Hopper Decl. ¶ 10. That concession is significant because Brewer's claims arise from a February 2024 App transaction. Compl. ¶ 56. There is no evidence Brewer accessed the App prior to the 2019 redesign.

### C. The Presumption of Arbitrability Does Not Apply Because the Agreement Is Not Ambiguous

JMFS invokes the presumption of arbitrability as a fallback, arguing that even if the agreement is ambiguous as to whether it covers App-based claims, the Court should resolve that ambiguity in favor of arbitration. But the presumption only applies where the agreement is genuinely ambiguous. *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014). As the authority cited by JMFS confirms, courts discharge their duty by "applying the presumption of arbitrability only where a validly

---

other contexts. *See Robles v. Yum! Brands, Inc.*, No. 216CV08211ODWSS, 2018 WL 566781, at *2 (C.D. Cal. Jan. 24, 2018) (pleading separate causes of action for inability to access defendant's website and mobile application); *Doe v. Hey Favor, Inc.*, No. 23-CV-00059-WHO, 2023 WL 9955355, at *1 (N.D. Cal. May 24, 2023) (denying motion to sever and finding distinction between capture of health information through mobile apps versus websites).

formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand." *Granite Rock Co. v. Int'l Bhd. Of* Teamsters, 561 U.S. 287, 301 (2010). The 2018 Website Terms are not ambiguous. The arbitration clause covers disputes "relating in any way to this Website." "This Website" is an unambiguous, singular, platform-specific reference. There is no ambiguity to resolve; the agreement simply does not cover the App. A court need not reach the presumption of arbitrability where the text provides a clear answer, and here it does.

**D. Brewer's Claims Arise Exclusively from App-Based Transactions**

JMFS argues that under *Simula, Inc. v. Autoliv, Inc.*, Brewer's factual allegations need only "touch matters" covered by the agreement to require arbitration. 175 F.3d 716 (9th Cir. 1999). But the "touch matters" test presupposes a broad agreement whose subject matter overlaps with the dispute. *Simula* concerned the breach of a non-compete agreement that contained an arbitration clause. There was no no daylight between the agreement and the dispute. Here, the Agreement's defined subject matter is "this Website" – and Brewer's claims concern whether service fees were adequately disclosed to consumers based on representations and ordering flow presented to consumers *in the App*. The App is never mentioned in the 2018 Website Terms.

*Johnson v. Walmart Inc.* makes clear that *Simula*'s "touch matters" test requires courts to look at the plain meaning of the agreement to determine its subject matter. 57 F.4th 677 (9th Cir. 2023). In *Johnson*, Walmart moved to compel arbitration of

claims arising from an in-store service agreement under website terms of use that had governed an earlier, related online transaction. *Id*. at 679-680. The court focused on the introductory clause of the agreement, which "bounds the subject matter to which the agreement applies: 'access to and use of all Walmart Sites,'" and held the agreement's scope was limited to online transactions—full stop. *Id*. at 682. The fact that Walmart's website and retail stores sold identical merchandise and the dispute concerned the same product and the same parties did not change the analysis. *Id*. at 683. The same analysis applies here, and *Johnson* is almost directly on point and dictates the result here. Claims about fees charged through an independent App do not "touch" a website's Terms of Use agreement any more than an in-store dispute touches Walmart's website Terms of Use. In fact, this case is even easier than *Johnson*, because in *Johnson* the plaintiff's in-store purchase of the tire service agreement at least directly related to the plaintiff's purchase of tires through the website; here, Brewer did not use the Jersey Mike's Website at all.

JMFS's additional cited authority does not compel a different result. *Edwards v. TikTok, Inc.* is inapposite, because the arbitration clause at issue there expressly covered disputes relating to the defendant's "services and/or products, including the Services, or relating in any way to the communications between you at TikTok" – platform-neutral language that by its nature encompasses any channel through which those services are delivered. 804 F.Supp.3d 1049, 1053 (C.D. Cal. 2025). *Edwards* illustrates that parties who intend their arbitration clause to reach across platforms

know precisely how to draft one. JMFS just failed to do so. *Keane v. 40 Years, Inc.* fares no better. In that case, the district court found the defendant's counterclaims would turn on factual issues intertwined with the relationship of the parties, a matter which was governed directly by the agreements containing the arbitration clause. *Id*. No. C18-1768 RSM, 2018 WL 4014769, at *5-6 (W.D. Wash. Apr. 11, 2019).

**E. JMFS's "Factually Intertwined" Theory Fails**

JMFS argues that because Brewer's claims touch on JMFS's fee disclosure practices—and those practices exist on both the Website and the App, even though the UIs for the Website and App are different—they are "factually intertwined" with the website and thus arbitrable. This argument ignores the gravamen of Brewer's Complaint, which is whether the App's UI was designed in a way that confused or misled consumers about the nature of fees charged on delivery orders. JMFS's primary authority for this theory, *Saeedy v. Microsoft Corp*., 757 F. Supp. 3d 1172, 1204 (W.D. Wash. 2024), involved an agreement covering Microsoft's "Services," linked to a list of "Covered Services" that explicitly enumerated a range of consumer products – and separately incorporated Microsoft's privacy statement covering data collected through those services. The *Saeedy* agreement was broadly drafted to cover an entire product ecosystem. The agreement here covers "this Website," defined by a single URL. The two are not comparable.

*Doe v. Kaiser Found. Health Plan, Inc*. does not rescue JMFS's position. 725 F.Supp.3d 1033 (N.D. Cal. 2024). In *Kaiser*, the court compelled arbitration of claims

arising from the defendant's mobile application. The plaintiff resisted arbitration based on terms and conditions covering the app which did not include an arbitration clause. *Id*. at 1038. However, the mobile application was expressly integrated into plaintiff's Explanation of Coverage ("EOC"), which did contain an arbitration clause which the plaintiff had agreed to. The EOC directed members to the app to review and access benefits and services provided under the EOC in over forty instances. No comparable integration exists here. The 2018 Website Terms do not reference the App once, let alone forty times. *Kaiser* compels arbitration where a parent agreement expressly encompasses a mobile app as a subsidiary platform. It has nothing to say where, as here, the agreement is silent about the App altogether.

*SmartText Corp. v. Interland, Inc.*, an out-of-circuit case decided under Kansas state law, is equally unavailing. 296 F.Supp.2d 1257 (D. Kan. 2003). *SmartText* extended an arbitration clause across two closely linked websites—the same platform type, operating in the same medium, under the same technical architecture. *Id*. It did not, and could not, speak to whether a website-scoped arbitration clause can reach a categorically different platform. The App is not a second website; it is an independently operating software platform with its own distinct user interface that has always functioned entirely separately from the website, even when it shared similar content prior to 2019. The question presented here was simply never before the *SmartText* court.

JMFS contends that when forming an agreement to the 2018 Website Terms,

the parties "would have understood that any claim about ordering food on the app would relate to the website" because the App at that time was largely a mirror of the website. Mot. at 14. Setting aside that this argument presumes valid formation, JMFS has presented no evidence Brewer ever accessed the App prior to 2024, let alone understood any similarities in content between the two platforms in 2018. Moreover, even if Plaintiff had used the App in 2018, JMFS's evidence-less and citation-less assertion is still untrue: a reasonable person reading the 2018 Website Terms in 2018 while using the App would *not* have had that understanding, despite the similarities *at the time* between the App's and the website's content, including because the Terms never mention the app. Not once.

Brewer seeks to represent a class of consumers who were charged an unlawful fee when making delivery purchases through the App. Compl. ¶¶ 25-34. The success of Brewer's claims will depend on evidence of misrepresentations drawn exclusively from the App. The fact that JMFS engaged in similar conduct through its website does not automatically bring Brewer's App-based claims within the scope of an agreement governing Website use.

**F. JMFS's Remaining Arguments Each Fail**

JMFS advances three other, narrow reasons why Brewer's App-specific claims necessarily implicate the Website: overlapping discovery, the scope of injunctive relief, and the risk of issue preclusion. None holds up.

JMFS asserts that discovery about disclosure practices will "largely overlap"

between the App and the Website. But the scope of discovery in this action is defined by Brewer's claims, not by the breadth of JMFS's internal records. The fact that JMFS chose to use the same fee disclosure practices across both platforms is a business decision by JMFS, not a basis for the *unilateral* expansion of an arbitration clause that Brewer never agreed would cover App-based claims. Allowing a defendant to bootstrap its own operational decisions into an arbitration agreement would allow any defendant to expand arbitration clauses at will. JMFS will still have the opportunity to object to potential discovery requests in due time.

JMFS argues an injunction concerning the App would necessarily impact the Website, but the scope of any injunctive relief follows the scope of the claims. If the Court finds liability as to App-based disclosures, the reach of any injunction is a remedy question to be determined at that stage, not a reason to send App-based claims to arbitration under a website-only agreement. This argument, like the one above, put the cart way before the horse.

JMFS invokes *Hansen v. Musk* to argue that if Brewer prevails on his App-based claims, he could use issue preclusion in a later Website-based lawsuit to circumvent Section 3 of the FAA. 122 F.4th 1162, 1174 (9th Cir. 2024). This is speculative and circular. The appropriate response to a concern about future litigation is not to force Brewer to arbitrate claims he never agreed to arbitrate. It is to note that any future Website-based claim would be governed by its own arbitration agreement. JMFS cannot use the specter of hypothetical future litigation to stretch the present

agreement beyond its plain terms.

### G. Brewer's Own Statements Cannot Expand the Scope of the Arbitration Clause

JMFS repeatedly relies on Brewer's April 2024 pre-suit demand letter, which referred to a "Digital Ordering Platform," defined to include both the website and mobile app, to argue Brewer himself understood the two platforms to be one. But the scope of an arbitration clause is determined by the agreement's text at the time of formation – not by how a party characterizes its claims in a demand letter six years later. The demand letter reflects Brewer's pre-suit theory of a common fee policy, before any discovery has been had; it is not an admission the 2018 Website Terms' arbitration clause covers the App, and of course that letter is not admissible evidence anyway under Rule 408.

JMFS points to the Complaint's allegations JMFS controlled "how the Service Fee was communicated to consumers on and through Jersey Mike's official website and App" as evidence that Brewer's Complaint directly challenges the website. *See* Compl. ¶ 176. Brewer's single passing reference to the website in a complaint spanning 44 pages does not transform the foundation of the Complaint, which is unmistakably about the App's representations to consumers. Nevertheless, JMFS does not dispute that it was in exclusive control of the website and App at all times relevant to this action and *never* modified the scope of the arbitration provision in question to include the App, as is routine (and legally required) in cases where

arbitration is compelled in factually analogous cases. JMFS simply screwed up when drafting its arbitration clause and so asks this Court to rescue it from its own mistake. The Court should not do that.

JMFS further argues Brewer's allegation that "mobile orders account for 40% of Jersey Mike's sales" actually reflects both website and App orders, meaning Brewer's own damages calculation encompasses website orders. *See* Compl. ¶ 54. That is not a fair reading of the Complaint. Brewer alleges the Service Fee "likely resulted in tens of millions of dollars in revenue." Brewer does not provide a precise accounting of damages, nor is he required to at the pleading stage. Brewer's calculation reflects the ceiling of JMFS's unjust enrichment, not an admission that website transactions are at issue.

JMFS's entire "Brewer said so himself" theory rests on characterizations made years after contract formation – none of which have any bearing on what the parties objectively agreed to in 2018.

## II. INDEPENDENTLY, JMFS FAILS TO ESTABLISH THE EXISTENCE OF AN ENFORCEABLE ARBITRATION AGREEMENT

The Court need not reach the parties' formation dispute because JMFS cannot establish the arbitration provision encompasses Brewer's claims. If the Court does reach that issue, however, JMFS independently fails to carry its burden of proving the existence of an enforceable agreement to arbitrate. JMFS's formation theory depends on a series of events occurring years before Brewer's 2024 App transaction, including

a purported website enrollment in 2013 and a 2018 email concerning revised Website terms. JMFS identifies no App-based assent event and no occasion on which Brewer was presented with arbitration terms in connection with his use of the App. On this record, JMFS has not established mutual assent to arbitrate the claims asserted here.

### A. The App Did Not Provide Any Notice of Terms

In an admission that is fatal to its motion, JMFS concedes Brewer was not required to accept or acknowledge any terms when logging into the App and placing an order. Hopper Decl. ¶¶ 11-14. JMFS admits Brewer could always log into the App using his rewards account without being subject to any new App-based sign-up or onboarding. *Id*.

Courts have consistently declined to enforce similar "browsewrap" agreements which do not require an App user to expressly manifest assent to the terms and conditions. *See, e.g., Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1178–79 (9th Cir. 2014). Browsewrap agreements are only binding when an App user has "actual or constructive knowledge" of the App's terms and conditions. *Id.* at 1176. JMFS can establish neither.

The Ninth Circuit has stressed that the onus is on app operators to put users on notice of the terms to which they wish to bind consumers. *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1220 (9th Cir. 2019) (citing *Nguyen*, 763 F.3d at 1179). Courts typically look at the conspicuousness and placement of the terms and conditions, as well as the content and overall design of the app. *See id.*; *see also Berman v. Freedom*

*Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (finding that the court must assess the visual appearance of an app to determine whether it provides reasonably conspicuous notice).

But JMFS offers no screenshots, no mockups, no archived captures, and no testimony describing what the App displayed to users at onboarding at any point during which Brewer was using it. If JMFS contends the App adequately presented the terms of use to users, it should be capable of demonstrating this through its system records. It has not done so. The Court cannot find any constructive notice based on this record.

The inadequacy of JMFS's evidentiary record is compounded by the nature of the onboarding evidence it did produce. JMFS describes account-creation screens that prompt new App users to verify they have read and agreed to Jersey Mike's Terms of Use and contends that users who navigate to the App's "Legal" section are shown the Website Terms. But JMFS does not—and cannot—contend that Brewer ever encountered those screens. Because Brewer logged into the App using pre-existing rewards account credentials, he was never routed through a new-account creation flow. JMFS's evidence establishes, at most, that a hypothetical new App user creating an account today would encounter a reference to the Terms – not that Brewer, a legacy rewards member logging in with existing credentials, was ever presented with any such notice. *See White v. PayPal Holdings Inc.*, No. 25-CV-04884-PCP, 2026 WL 496712, at *5 (N.D. Cal. Feb. 23, 2026) (denying motion to

compel arbitration where defendants failed to provide evidence of what plaintiffs saw during sign up).

**B. JMFS Cannot Rely on the April 2018 Email for Notice**

JMFS's ability to bind Brewer to the 2018 Website Terms depends entirely on the modification clause in the 2013 Website Terms, which authorized JMFS to update those terms upon posting and continued use. The mechanism of modification—posting to the website, continued use of the website—was tethered entirely to the website. The right JMFS reserved was the right to update what its terms said about the website, not to unilaterally expand the subject matter of those terms to encompass wholly separate platforms that were not governed by the terms when Brewer first agreed to them. The 2013 Website Terms themselves stated they applied "ONLY to those areas that are on the Jersey Mike's web site." ECF No. 22-2 at 1. A modification clause operating within that boundary cannot be used to reach outside it. To hold otherwise would mean any consumer who once agreed to website terms of use—for any website, on any platform—could be unilaterally subjected to arbitration of disputes arising from any product or platform the operator later chooses to associate with that website, without any new act of assent.

JMFS instead relies on its April 25, 2018 email to support formation. JMFS contends Brewer accepted the terms when he received the email, viewed it, and clicked on the incorporated hyperlink which directed him to the 2018 Website Terms published on Jersey Mike's website.

The email stated: "We've updated our website's Terms & Conditions and Terms of Use. . . . Your continued use of our website from that day on, is subject to the new Terms. . . . By accessing our website, you agree to comply with and be bound by the updated Terms." The subject line reads "Terms & Conditions Update" with no reference to the App.

The mismatch between the account that received the email and the account through which Brewer actually used in the App is independently fatal to JMFS's formation theory. The 2018 email was sent to Jersey Mike's Email Club members, a program wholly separate from the rewards program. Hopper Decl. ¶¶ 25-27. The Email Club does not require the creation of an account and participation is not necessary to place an order on the App. Brewer became a rewards member by physically signing up in-store before 2013, and it was those credentials—not any Email Club account—that he used when logging in to the App. JMFS has produced no evidence the rewards program account through which Brewer accessed the App was ever governed by the 2018 Terms. Its entire formation theory runs through the Email Club: Brewer joined the Email Club in 2013, the Email Club terms authorized modifications, JMFS emailed Email Club members in 2018, and Brewer clicked the link. Even accepting every step of that chain, it establishes at most that Brewer's Email Club participation became subject to the 2018 Website Terms, not that his separate rewards account was swept into the same agreement. JMFS cannot use an email sent to Email Club members to bind a rewards account it never notified,

through a platform it never mentioned, to arbitrate claims it never covered.

JMFS's fallback position—that Brewer manifested assent through six years of continued use of the website and App—fares no better, because the 2018 email defined the act of acceptance in website-specific terms. The email stated that "[y]our continued use of our website from that day on, is subject to the new Terms" and concluded that "[b]y accessing our website, you agree to comply with and be bound by the updated Terms." Continued website use was the specified act of acceptance. JMFS cannot now argue that App use constituted acceptance of terms when, by its own terms, only website access constituted the triggering conduct. Brewer had no reason to know that opening the App would be treated as acceptance – because the only document JMFS sent him said the opposite. Whatever assent continued App use might theoretically support, it cannot exceed the scope of the terms it purportedly accepted – terms that cover disputes relating to the website, not the App. Continued use binds a party to what the agreement says; it does not *expand* what the agreement covers.

JMFS relies upon *Ireland-Gordy et al. v. Tile, Inc. et al.*, No. 25-403, 2026 WL 594859, at *1 (9th Cir. Mar. 3, 2026) in support of its argument that the email notice was sufficient, but the legal test JMFS attributes to that opinion does not appear in the opinion, and the facts on which the court actually based its holding are materially different from the facts JMFS presents here. What the Ninth Circuit actually applied was a cumulative, three-factor inquiry notice test asking whether,

viewed together, "(1) the 'context of the transaction'; (2) the app or website's design and content; and (3) 'other notices given to users' — would have led 'a reasonably prudent user' to read the provider's terms of service." *Id.* at *3 (citations omitted). The court also issued an express caveat: "Evaluating whether inquiry notice has been established is, however, always a 'fact-intensive analysis,' . . . and we do not hold that notice by mass email establishes inquiry notice in every case." *Id.* at *4. (citing *Godun v. JustAnswer LLC*, 135 F.4th 699, 710 (9th Cir. 2025) (holding that arbitration agreement was not formed, in a situation much closer than the one here that even involved a clickwrap agreement, because the link to the terms and conditions was insufficiently conspicuous and there was no manifestation of assent to them).

In *Ireland-Gordy*, defendant sent accountholders an email notifying them of an update to its terms that advised accountholders that accessing defendant's app *or* website would manifest assent. *Id.* at *1. The court's finding that the plaintiffs assented by subsequently using the app rested entirely on this explicit, advance identification of app use as the act of agreement. *Id.* at *4 n.6. The JMFS email contains none of this. The word "app," "mobile," or "application" appears zero times. Unlike the email in *Ireland-Gordy*, which explicitly told users app use would constitute acceptance, the JMFS email told users only *website* access would constitute acceptance.

This distinction is dispositive under the assent standard *Ireland-Gordy* itself

applies. The court reaffirmed that "the conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Id*. at *2. In *Ireland-Gordy*, users had reason to know that using the app would be treated as acceptance – because the email told them so in express terms. Brewer here had no such reason to know. Nothing in that email, read by a reasonable person, would convey that opening the mobile App—an entirely separate platform that the email never mentioned—was being treated as acceptance of an arbitration agreement.

*Ireland-Gordy* measures the distance between what adequate notice requires and what JMFS actually provided. The *Ireland-Gordy* defendant explicitly mentioned app use as an act of acceptance in its notice email and still drew an express caution from the Ninth Circuit about the limits of email notice. JMFS's email falls well short of the floor *Ireland-Gordy* establishes. And *Godun*, 135 F.4th at 710, which outlined the history of this law in the Ninth Circuit, is just piling on: if there was no agreement to arbitrate in that case, there is absolutely no way there can be one here.

*Ghazizadeh v. Coursera, Inc*. does not compel a different result. 737 F. Supp. 3d 911, 922-23 (N.D. Cal. 2024). *Coursera* was a web-only case in which the defendant's entire product was delivered through the browser; there was no mobile application at issue, and the court had no occasion to consider whether website-based notice can bind a user to arbitration of claims arising from a separate platform the

terms never mention. *Coursera* answers the question of how a defendant gives adequate notice of updated website terms to website users. It does not answer whether that same notice is sufficient to bind an app user to arbitrate app-based claims, which is the only question that matters here.

## CONCLUSION

This case arises from a transaction completed through the App and challenges disclosures presented through the App's ordering and checkout process. The Website Terms JMFS seeks to enforce limit themselves to disputes relating to "this Website" — they never mention the App, never define "Website" to include it, and never state that App-based claims are covered. Even if the Court were to reach JMFS's formation theory, JMFS has not carried its burden of proving an enforceable agreement to arbitrate Brewer's App-based claims. Plaintiff respectfully requests that the Court deny the Motion to Compel Arbitration.

DATED: June 5, 2026

Respectfully submitted,

**LEE SEGUI, PLLC**

/s/ Erin J. Ruben
Erin J. Ruben*
Thomas A. Pacheco (SBN 351445)
900 W. Morgan Street
Raleigh, NC 27603
eruben@leesegui.com
tpacheco@leesegui.com
(919) 421-7266 (phone)

Harper T. Segui**
825 Lowcountry Blvd., Suite 101
Mt. Pleasant, SC 29464
(843) 790-6520 (phone)
hsegui@leesegui.com

**MILBERG PLLC**
Alex R. Straus (SBN 321366)
280 S. Beverly Drive, PH Suite
Beverly Hills, CA 90212
(866) 252-0878 (phone)
(615) 921-6501 (fax)
astraus@milberg.com

***Attorneys for Plaintiff and the Class***

****Admitted Pro Hac Vice***
*****Pro Hac Vice Motion Forthcoming***

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2026, the foregoing was filed using the Court's CM/ECF service, which will send notification of such filing to all counsel of record.

**LEE SEGUI, PLLC**

/s/ Erin J. Ruben
Erin J. Ruben*
421 N. Harrington St., Suite 460
Raleigh, NC 27603
(919) 421-7266 (phone)
eruben@leesegui.com